

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 8, 2023

**BY ECF**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Cary Yan*, 20 Cr. 402 (NRB)

Dear Judge Buchwald,

  The Government respectfully submits this letter in advance of the sentencing of defendant Cary Yan. The parties have stipulated to an applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 57 to 60 months' imprisonment. For the reasons explained below, a sentence of 57 months' imprisonment, the bottom of the stipulated Guidelines range, would be sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

  A. Factual Background

    1. The Republic of the Marshall Islands

  The Republic of the Marshall Islands, or "RMI," is located in the central Pacific Ocean. The nation consists of 29 separate atolls, or island chains. The United States liberated the Marshall Islands from the Japanese Army during the Second World War, and governed them until 1979, when the RMI became an independent nation. The RMI and the United States then entered into a compact of free association that gives the United States responsibility to defend the Marshall Islands and to provide certain government functions (such as postal service), and allows RMI citizens the right to emigrate to and work in the United States. The United States maintains a military base on Kwajalein, the RMI's second most populous island. The RMI uses the U.S. dollar as its currency, and English and Marshallese are its official languages. (PSR ¶ 15).

  The lower house of the RMI legislature (the "Nitijela") holds most of the governing power. The lower house consists of 33 senators, who are democratically elected. The Nitijela can enact legislation and elects the president. The president has significant authority while in office, but can be replaced by a simple majority vote of no confidence in the lower house. (PSR ¶ 16).

Yan's and Zhou's connection to the RMI predates the primary events of this case. Both hold Marshallese citizenship and passports. Before the events directly at issue here, Yan and Zhou traveled to the RMI on several occasions, where they met with various locals in connection with proposed business ventures such as a stock exchange located in the RMI. (PSR ¶ 17).

### 2. Yan Purchases the WOGC

In 2001, a New York resident (the "Founder") established a non-governmental organization (the "NGO") in Manhattan. The NGO was dedicated to international development, and initially focused on education projects in Ghana. Domestically, the NGO is a 501(c)(3) charity incorporated in New York State. In 2008, the NGO received "consultative status" with the UN's Department of Economic and Social Affairs ("ECOSOC"). Consultative status with ECOSOC is an important credential that allows an NGO access to certain UN events and enhances the NGO's reputation because consultative status indicates that the UN believes the NGO to be legitimate. (*See* PSR ¶ 19 & n.1).

In 2016, Yan requested that a man named Francis Lorenzo—then a deputy ambassador to the UN from the Dominican Republic, who lived in New York City—introduce him to the Founder.[1] At Yan's request, Lorenzo proposed that Yan would replace the Founder as the president of the NGO—with the Founder becoming the vice president—in return for which the Founder would receive a regular salary and Yan would fund the NGO's development work. The Founder accepted the deal. In return for Lorenzo's efforts, Yan transferred $1 million to an investment fund in New York controlled by Lorenzo. (*See* PSR ¶¶ 19-20 & n.1).

In July 2016, Yan and the Founder entered into a formal memorandum of understanding. Under its terms, the NGO changed its name to the World Organization of Governance and Competitiveness ("WOGC"), and Yan became the WOGC president. The Founder made official filings with the UN and New York State Department of State to ensure that WOGC assumed the NGO's ECOSOC consultative status at the UN, and its status as a charitable corporation in New York. (*See* PSR ¶ 20).

After July 2016, Yan and Zhou established and intermittently operated from WOGC's Manhattan offices, located at 777 Third Avenue. During that time, the Founder became increasingly disillusioned with Yan and Zhou, who she believed were misusing the NGO for their personal profit, deceiving the UN representatives of various foreign governments through false promises of development projects, and ruining the good reputation the Founder had built for the NGO that she had established. In March 2018, the Founder made unchallenged filings with the UN and New York State, reverting WOGC's name to the NGO's original name and reestablishing herself as the organization's president. Yan and Zhou, however, continued to use the 777 Third Avenue address and the WOGC name in their dealings abroad. (PSR ¶¶ 21-22).

---

[1] Lorenzo pled guilty in an unrelated bribery scheme. *See United States v. Ng Lap Seng, et al.*, 15 Cr. 706 (VSB).

### 3. The 2017-18 Attempt to Create the RASAR

Beginning at least as early as December 2016, Yan and Zhou began their association with WOGC in emails arranging meetings with Marshallese officials. (Because Yan does not speak English, Zhou typically corresponded with the Marshallese on his behalf, and acted as an interpreter during his meetings with English speakers.) Those meetings occurred both in the RMI and in Manhattan. For example, on July 14, 2017, Yan and Zhou met with a Marshallese official twice at the RMI's UN mission in Manhattan. After the second meeting, that official requested that WOGC purchase several international, first-class flights for her and her associates to fly to a conference in another Pacific island nation, and Zhou did so. (PSR ¶¶ 18, 23-24).

In 2017, Yan and Zhou met with another Marshallese Official ("Official-1"), who served as the mayor of the Rongelap Atoll, a region of the RMI. Yan and Zhou met with Official-1 both in New York and in the RMI. Yan invested in a private venture run by Official-1, and Official-1 appointed Yan a "special advisor" to the Rongelap Atoll, with duties focused on planning and implementing a special administrative region there—plans that would later become known as the Rongelap Atoll Special Administrative Region (the "RASAR"). (PSR ¶ 25).

In April 2018, WOGC publicly "launched" the RASAR project. The RASAR would be created by legislation that, if enacted by the RMI legislature, would significantly change the laws on the Rongelap Atoll to make the region more hospitable to investment and commerce, including by lowering or eliminating taxation and relaxing immigration regulations. At times, Yan planned to use the RASAR to create one or more casinos in the Rongelap Atoll, as well as to base various online ventures there, including a cryptocurrency business, and to attract investors and customers. (PSR ¶ 26). In addition, at various times the RASAR proposal included the authority to issue passports, which would have been potentially valuable because, as noted above, a person traveling on an RMI passport can emigrate to and work in the United States without a visa.

WOGC announced the launch of the RASAR initiative at an April 2018 conference it hosted in Hong Kong, but which was planned in significant part from WOGC's Manhattan headquarters. Yan, Zhou, and subordinate members of WOGC attended. Three RMI officials attended the conference, including Official-1. The other two officials ("Official-2" and "Official-3") were members of the RMI legislature. WOGC paid for these officials' travel to Hong Kong, and for their luxury accommodations and entertainment there. WOGC publicly introduced the RASAR proposal, and Official-2 gave a speech praising it. (PSR ¶ 27).

In mid-August 2018, Official-3 and other RMI legislators officially introduced the bill to create the RASAR. From that point through October 2018, Yan and Zhou tried to persuade the RMI legislature to pass the RASAR bill, including through bribery. For example, Yan and Zhou offered an RMI legislator ("Official-5")[2] approximately $10,000 in cash to vote for the RASAR, which Official-5 refused; Yan and Zhou made a similar payment to Official-3, who accepted the bribe; and Zhou made a $22,000 "loan" to another RMI legislator ("Official-4"), on which Official-4 appeared to have made no payments as of June 2020, and which was interest free. In total, the bribes Yan and Zhou paid and attempted to pay to RMI officials in return for their support

---

[2] The labels of the RMI officials are not sequentially numbered here because this memorandum uses the same labels as the Indictment.

of the RASAR exceeded $40,000. Yan and Zhou worked hand-in-glove with RMI officials whose support they had won, including Official-1, Official-3, Official-4, and another RMI legislator ("Official-6") who was related to the RMI official for whom WOGC had bought plane tickets in 2017. (*See* PSR ¶¶ 28-30).

Notwithstanding Yan's and Zhou's efforts to bribe supporters, by November 1, 2018, it had become clear that the RMI legislature would not enact the RASAR legislation. Although Yan had significant support from members of the RMI's legislature, he was unable to secure the support of the then-President of the RMI (the "Former President") and her supporters. After the RMI proposal failed, Yan's allies then attempted to have the Former President removed from office through a vote of no confidence. On November 12, 2018, the vote was held, and the Former President's government survived. (PSR ¶ 31).

### 4. The Second Attempt to Create the RASAR

After the November 2018 failure of the RASAR, Yan and Zhou remained in touch with their RMI allies. In a December 2018 email, Official-6 promised Yan and Zhou "revenge" against the Former President for her opposition to the RASAR. (PSR ¶ 32).

On November 18, 2019, the RMI held elections for the legislature. The Former President's party lost several seats, and no longer enjoyed a majority. On January 13, 2020, the new RMI legislature elected a new president. In early February 2020, Yan and Zhou began corresponding with their RMI contacts, visiting them in the RMI from approximately February 2 to February 13, 2020, to discuss restarting the RASAR initiative. On February 14, 2020, Yan and Zhou emailed Official-6, promising that if the RASAR passed, Official-6's "family will be one of the most powerful family! [sic]." (PSR¶ 33).

In late February 2020, the legislature began considering a resolution that would endorse the concept of a RASAR, a preliminary step that could allow enacting the more detailed RASAR legislation at a later date. In early March 2020, Yan and Zhou returned to the RMI to attempt to secure passage of the legislation. Zhou began regularly corresponding with Official-1, Official-2, Official-3, Official-4, and Official-6 to marshal support for this resolution. (PSR ¶ 34).

On March 7, 2020, Yan and Zhou met with a relative (the "Relative") of Official-3. Zhou recorded this meeting on her iPhone, presumably as potential leverage over Official-3. During the meeting, Yan and Zhou gave the Relative $7,000 to pass on to Official-3, who was to use this cash to bribe other RMI legislators to support the RASAR resolution. Yan and Zhou also stated that they knew that Official-3 needed additional cash for this purpose, and that they would get that money shortly. Yan and Zhou further discussed having previously brought larger sums of cash into the RMI through the United States, implicitly for similar purposes. (PSR ¶ 35).

On March 20, 2020, the RMI legislature passed the resolution. Progress on the ultimate passage of the RASAR appeared to have slowed with the outbreak of the COVID-19 pandemic, and halted when Yan and Zhou were arrested in November 2020 on the charges in this case. (PSR ¶ 36).

B.  **Procedural History and Guidelines Calculation**

On August 10, 2020, a grand jury returned Indictment 20 Cr. 402 (NRB), which charged Yan and Zhou in five counts, with violations of the Foreign Corrupt Practices Act and related money laundering offenses. In November 2020, Yan and Zhou were arrested in Thailand. They each elected to contest extradition in Thai courts, and thus were not extradited to the United States until September 2022. On December 1, 2022, Yan pled guilty pursuant to a plea agreement to Count One of the Indictment, which charged him with conspiring to violate the Foreign Corrupt Practices Act, in violation of 18 U.S.C. § 371.[3]

In the plea agreement, the parties stipulated to a Guidelines range of 57 to 60 months' imprisonment. The offense level is 25: a base offense level of 12 under U.S.S.G. §§ 2X1.1(a) and 2C1.1(a)(2), with a two-level increase under U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe, a six-level increase under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(D) because the value of the bribe payments was between $40,000 and $95,000, a four-level increase under U.S.S.G. § 2C1.1(b)(3) because the offense involved elected public officials, a four-level increase under U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants and that was otherwise extensive, and a three-level decrease for acceptance of responsibility. The defendant's criminal history category is I, and the resulting Guidelines range, as limited by the five-year statutory maximum sentence, is 57 to 60 months' imprisonment. The Probation Office agrees that this Guidelines calculation is correct (PSR ¶¶ 42-58, 95-96), and recommends a below-Guidelines sentence of 42 months' imprisonment (PSR at 24).

C.  **Discussion**

   1.  **Applicable Law**

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

---

[3] Yan is not a U.S. citizen, and has indicated that he intends to consent to the entry of a judicial order of removal. (Def. Mem. 11). A proposed order and supporting documentation—which Yan and his counsel have not yet signed—are attached as Exhibit A.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence for criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A 57-Month Sentence Is Appropriate in This Case

This is a case in which the Guidelines understate the seriousness of the offense. While the Guidelines in FCPA cases are typically driven by large bribe amounts and anticipated benefits, here the defendant was able to bribe officials from the RMI relatively cheaply. Yet bribery—in large and small amounts alike—causes significant global harm. And while there are certain mitigating factors here as well, those factors are already accounted for by the plea offer and resulting Guidelines range. On balance, as explained below, a Guidelines sentence of 57 months' imprisonment is necessary to accomplish the purposes of sentencing.

*First*, a substantial sentence is warranted by the nature and circumstances of the offense and the need to provide just punishment. Indeed, if these were the only factors at issue, the Government might well have sought a significantly longer sentence. Yan's crimes were serious. He corrupted a Manhattan NGO that had previously done legitimate humanitarian work, turning it to his own purposes to facilitate his bribery scheme. In that scheme, Yan bribed multiple democratically elected legislators to vote for legislation creating RASAR. When those initial efforts failed despite Yan's bribery, Yan sought to destabilize a sovereign government, attempting to engineer a no-confidence vote that would oust the RMI's president as revenge for her refusal to support Yan's corrupt scheme.

That kind of bribery causes real and lasting damage to society. Conduct like Yan's erodes confidence in democracy not only in the RMI, but in other developing democracies as well. As then-Secretary-General of the UN Kofi Annan remarked in 2003:

> Corruption is an insidious plague that has a wide range of corrosive effects on societies. It undermines democracy and the rule of law, leads to violations of human rights, distorts markets, erodes the quality of life and allows organized crime, terrorism and other threats to human security to flourish.
>
> This evil phenomenon is found in all countries—big and small, rich and poor—but it is in the developing world that its effects are most destructive. Corruption hurts the poor disproportionately by diverting funds intended for development, undermining a Government's ability to provide basic services, feeding inequality

> and injustice and discouraging foreign aid and investment. Corruption is a key element in economic underperformance and a major obstacle to poverty alleviation and development.

United Nations Convention Against Corruption, Foreword, https://www.unodc.org/documents/treaties/UNCAC/Publications/Convention/08-50026_E.pdf.

One particularly pernicious effect of bribery is that when it succeeds, it effectively transfers wealth to the corrupt at the expense of everyone else—governments, legitimate businesses, and ordinary law-abiding citizens alike. And Yan, it is clear, stood to profit handsomely. To be sure, the amounts of Yan's bribes to Marshallese officials were relatively modest. He was apparently able to buy multiple votes in support of the RASAR for five-figure sums. But the circumstances strongly imply that Yan stood to make millions of dollars from his crimes. Otherwise, his willingness to separately pay a million dollars to Francis Lorenzo to obtain control over the NGO and merge it with WOGC (PSR ¶ 19) to facilitate this scheme would make no sense. Yet because the specific amount Yan stood to gain is unknown, the Guidelines here are based on the more modest bribe amounts, and they thus understate the seriousness of the offense.

Yan downplays the profit motive of his crime. His sentencing submission claims that he was acting altruistically. Yan asserts that he supported the RASAR because he "believed it would stimulate development in the Marshall Islands and help lift people out of poverty," and that Yan lacked an "immediate financial stake in the initiative" and had only a "speculative" "possibility" of personal gain. (Def. Mem. 5).

Those claims fly in the face of common sense, which makes clear that bribing legislators to create business opportunities is, at least, a circuitous route to helping those in poverty. Bribery schemes benefit the schemers themselves, not those in poverty or the public more generally. More to the point, Yan's unsupported claim of a charitable motivation is belied by the factual record. As just noted, Yan paid a seven-figure sum to obtain the means to facilitate the RASAR bribery scheme. And he discussed plans to build casinos and online ventures including a cryptocurrency business in the Rongelap Atoll, which, after establishment of the RASAR, would receive favorable tax treatment. (PSR ¶ 26). Consistent with this, witnesses in the investigation described Yan's and WOGC's work in the RMI as motivated by profit, not charity. Yan's willingness to throw a huge amount of money at this project suggests he expected a substantial return and belies his self-serving claim of charity.[4]

*Second*, the needs for general deterrence and to promote respect for the law counsel in favor of a substantial sentence. "Considerations of … deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime." *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir.

---

[4] The Probation Office's recommendation of 42 months' imprisonment is too low in part because it appears to credit Yan's claim that he was paying bribes in order to help others, rather than to line his own pockets. (*See* PSR at 25 ("Regarding a sentencing recommendation, Yan may have had noble intentions in terms of investing in RMI however, his methods were wrong and illegal.")).

2018) (quoting *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994)). Yan's crime had both of these attributes.

As just discussed, Yan stood to gain substantial profits from his bribery scheme. This militates in favor of a harsher sentence to accomplish deterrence. *See, e.g.*, *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating the law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.").

Yan's bribery was also difficult to detect. It is particularly challenging to investigate and successfully prosecute international bribery schemes. When such schemes are discovered, and their perpetrators brought to justice, substantial sentences are warranted to deter future would-be bribe payers. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are … significantly more difficult to detect may warrant substantially higher penalties."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

*Third*, the need for specific deterrence also weighs heavy here. While Yan has accepted responsibility, his superficial claims of a benevolent motive are reason to doubt that he recognizes the gravity of his offense. So is Yan's claim that his offense was "an aberration." (Def. Mem. 14). This crime was not a momentary lapse in judgment. Yan played a long game. He acquired a UN-affiliated NGO, in order to position himself to bribe numerous RMI officials. When those initial bribes failed to accomplish Yan's goal of establishing the RASAR, he sought to boot the RMI's then-President from office. And although that attempt failed, when there was a change in administrations, Yan worked with the officials he had bribed to try again. It was only the combination of the pandemic and the charges in this case that ultimately foiled Yan's efforts.

Given Yan's persistent illegal and anti-democratic conduct, and his apparent failure to now recognize its seriousness, a substantial sentence is appropriate to send the message, both to the public and to Yan himself, that foreign bribery will be met with serious punishment.

### D. Yan's Request for a Sentence of Time Served Should Be Rejected

Yan argues that the Court should sentence him to time served, which would have the effect of immediately returning him to the RMI. But Yan's request for leniency gives short shrift to the seriousness of his offense, and the various premises on which it rests do not individually or collectively justify a time-served sentence.

*First*, Yan's personal history and characteristics do not support the dramatic downward variance he requests. There is no doubt that Yan had a difficult childhood. (*See* Def. Mem. 1-2, 7). But he evidently overcame that childhood, getting an education and developing, by all appearances, an extraordinarily successful career as a consultant. It is evidence of Yan's success that he was able to fund the significant expenditures involved in carrying out his bribery scheme. Yan's success and wealth gave him advantages that many defendants who appear before this Court

for sentencing lack. And the fact that Yan, despite these advantages and the total lack of justification, carried out this scheme, is deserving of substantial sanction, not leniency.

Yan also submits a number of letters attesting to his good character and his efforts to help people. (*See* Def. Mem. 7-8 & cited exhibits). It is, of course, appropriate for the Court to consider Yan's charity and his character at sentencing. But they do not distinguish Yan from any number of other white-collar defendants—people who, despite their success and opportunity, turn to crime. Recognizing this dynamic, the Guidelines and case law provide that "civic, charitable, or public service" and "similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range," unless they are "present to an exceptional degree." *United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005) (quoting and discussing U.S.S.G. § 5H1.11); *see also, e.g.*, *United States* v. *Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) (charity and good works are not "a get-out-of-jail card," as "it is usual and ordinary, in the prosecution of similar white-collar crimes … to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts" (internal quotation marks omitted)). As Judge Marrero observed in rejecting similar claims, the argument that the white-collar defendant has lived a successful and charitable life, while compelling "on the surface," is fundamentally flawed. *See United States v. Regensberg*, 635 F. Supp. 2d 306, 308-09 (S.D.N.Y. 2009), *aff'd* 381 F. App'x 60 (2d Cir. 2010). For one thing, it omits any consideration of the interrelated sentencing factors that focus on the seriousness of the offense. *Id.* For another, it is often precisely the defendant's good character and good reputation that enable him to carry out the crime. *Id.* at 309-10 (discussing the ways in which a white-collar defendant's charity and good reputation frequently "facilitate[] his life of crime"). Yan may very well deserve his apparent reputation for trying to help people, but he also leaned on that reputation in carrying out the yearslong scheme here.

Nor do Yan's age or health justify a dramatic downward variance. Yan is 51, and suffers from illnesses that are not uncommon among people his age, but he is hardly old and not in dire health. Yan's age and health did not prevent him from traveling frequently, all around the world, to carry out his scheme, and there is no reason to believe they cannot be appropriately managed by the BOP.

*Second*, Yan's incarceration during the extradition process does not justify the leniency he requests. That is not to say that Yan's time in custody between his November 2020 arrest and his September 2022 extradition is irrelevant. To the contrary, the Government agrees with the Court's remarks at co-defendant Gina Zhou's sentencing that incarceration *anywhere* during the height of the pandemic merits some leniency. And as the Government has previously noted to the Court, the Federal Bureau of Investigation inquired into the conditions of the defendants' incarceration, but was not able to either confirm the defendants' claims about the harshness of their incarceration or uncover evidence that those claims were inaccurate. However, in light of those factors, the Government made what it viewed as a generous and reasonable plea offer in this case: an offer with a five-year statutory maximum and Guidelines that were capped by that maximum. In other words, Yan's plea deal already accounts for this mitigating factor.

*Third*, the possibility that Yan will spend some time in immigration custody before being deported is not a basis for a downward variance. Yan's argument on this point is speculative: he says only that it is "likely" that he will spend time in immigration custody and that the conditions of that hypothetical custody "will likely be worse than what Cary has experienced at Westchester

county Jail and MDC." (Def. Mem. 11). In any event, Yan has indicated that he intends to consent to a judicial order of removal. If the Court enters that order, Yan will be required to spend little additional time in custody beyond his sentence. Yan's brief anticipated time in immigration custody is not a basis for the substantial variance he seeks.

*Finally*, the Court should reject Yan's claim that a sentence other than time served would generate unwarranted sentencing disparities. Yan's argument relies on misleading statistics and cherry-picked cases. An appropriate sentence would be based not on those inapposite examples, but on the application of the 3553(a) factors, which, as discussed above, support a Guidelines sentence here.

Yan's sentencing disparity argument begins with the presentation of various statistics. But aggregate statistics do not supply sufficient information to determine whether they relate to cases involving defendants "with similar records" or who committed "similar conduct." 18 U.S.C. § 3553(a)(6). For instance, Yan's statistic that the average sentence in all FCPA cases since 1977 was 29 months' imprisonment (Def. Mem. 11) has little bearing on the appropriate sentence here, because Yan offers no basis for the Court to discern the facts of the cases included in that average, or to determine where on the overall curve of FCPA cases Yan falls.

Yet that is the least irrelevant statistic Yan has offered. He next cites a list of all FCPA sentences imposed in the calendar years 2020 through 2022, remarking that the average "was less than 16 months' imprisonment." (Def. Mem. 12 & appendix). But that average is misleading both for what it includes and what it omits.[5] It includes multiple no-time sentences imposed in cases in which the Government filed Section 5K1.1 motions. *See, e.g.*, *United States v. Puckett*, No. 19 Cr. 150 (D. Conn.); *United States v. Thiessen*, No. 19 Cr. 181 (D. Conn.). And it omits lengthy sentences imposed in FCPA cases immediately before and after Yan's chosen time-period. *See, e.g.*, *United States v. Jho et al.*, 18 Cr. 538 (E.D.N.Y.) (ten-year sentence imposed on Roger Ng in March 2023); *United States v. Chacin Haddad et al.*, No. 19 Cr. 20351 (S.D. Fla.) (51-month sentences imposed on each of Luis Alberto Chacin Haddad and Jesus Ramon Veroes in September and October 2019).

Yan then turns to identifying individual FCPA cases in which courts imposed relatively light sentences. But his examples offer little guidance to the Court. It is no surprise that there are cases in which defendants were sentenced to less time than the Government or the Probation Office are recommending here. Nor is it any surprise that there are plenty of foreign bribery cases in which defendants received far longer sentences. *See, e.g.*, *United States v. Esquenazi et al.*, No. 09 Cr. 21010 (S.D. Fla.) (sentences of 180 and 84 months' imprisonment, respectively, for the president and vice president of a telecommunications company, who were convicted of FCPA and money laundering charges at trial); *United States v. Jumet*, No. 09 Cr. 397 (E.D. Va.) (87-month sentence after defendant pled to violating the FCPA by paying approximately $200,000 in bribes to Panamanian officials); *United States v. Thiam*, No. 17 Cr. 47 (DLC) (S.D.N.Y.) (84-month

---

[5] Yan also cites statistics relating to all sentences imposed under Guidelines Section 2C1.1 (Def. Mem. 12), but that section applies to a wide variety of offenses, and by definition does not only include similar defendants who committed similar offenses.

sentence for a former foreign public official convicted at trial of laundering bribes he received from executives of a Chinese conglomerate).

The Court will not create an unwarranted disparity by imposing a sentence higher than those imposed in the cases Yan cites and lower than those imposed in the cases mentioned above. A 57-month sentence would be appropriate here given the facts of this case, and thus in no way disparate from different sentences imposed to reflect different facts. Yan's unwarranted sentencing disparity arguments should be rejected.

### E.  Conclusion

For the reasons set forth above, a sentence of 57 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/
Lara Pomerantz
Hagan Scotten
Derek Wikstrom
Assistant United States Attorneys
Tel: (212) 637-2343/2410/1085


GLENN S. LEON
Chief, Fraud Section
Criminal Division

By:    /s/
Anthony Scarpelli
Trial Attorney
Tel: (202) 616-4988


Cc:    Counsel of Record